FILED
04/05/2019
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 16, 2019 Session

## DEMARIO LAWON FISHER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2015-A-408      Cheryl A. Blackburn, Judge**
_____

### No. M2018-00131-CCA-R3-PC
_____

Petitioner, Demario Lawon Fisher, pled guilty to attempted especially aggravated robbery, two counts of attempted first degree murder, and employment of a firearm during the commission of a dangerous felony in exchange for a total effective sentence of twenty-five years.  Petitioner subsequently filed a petition for post-conviction relief, alleging that he received the ineffective assistance of counsel and that his guilty plea was not knowing and voluntary.  The post-conviction court denied relief, and upon our review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT L. HOLLOWAY, JR., JJ., joined.

John H. Morris, Nashville, Tennessee (on appeal), and Kara L. Everett, Carthage, Tennessee (at hearing), for the appellant, Demario Lawon Fisher.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Factual and Procedural History*

On September 1, 2014, Petitioner escaped from the Woodland Hills Youth Development Center.  On October 29, 2014, two days before his eighteenth birthday,

Defendant shot the victim, Shayna Graves, and her friend, Rosalind Miller, after attempting to steal Ms. Graves's backpack. Defendant was arrested two days later.

Petitions were filed in Juvenile Court charging Petitioner with especially aggravated robbery; attempted criminal homicide; aggravated assault with a deadly weapon; handgun possession, second offense or more; and escape. After a hearing, Defendant's case was transferred to Criminal Court on December 19, 2014. On February 24, 2015, Defendant was indicted by the Davidson County Grand Jury for attempted especially aggravated robbery in Count One, attempted first degree murder with serious bodily injury in Count Two, attempted first degree murder without serious bodily injury in Count Three, employment of a firearm during the commission of a dangerous felony in Count Four, and escape from a juvenile detention facility in Count Five.

On May 20, 2016, Defendant entered guilty pleas to attempted especially aggravated robbery in Count One with a sentence of 8 years to be served at 30%; attempted first degree murder without serious bodily injury in both Counts Two and Three, each with a sentence of 20 years to be served at 30%; and employment of a firearm during the commission of a dangerous felony in Count Four with a sentence of 5 years to be served at 100%. Counts One through Three were run concurrently with each other and consecutively to Count Four, for a total effective sentence of 25 years.[1] The trial court indicated that Count Five was being dismissed.[2] The State provided the following factual summary of the offenses in this case:

> [O]n October 29th of 2014 in the evening hours[,] Ms. Sha[yna] Graves and Rosal[ind] Miller were students at TSU. They had been at the library working on a project. They took a study break and walked down to the Wendy's. While returning walking back with their food[,] the two ladies observed a male subject exit a vehicle that was parked on the street. Ms. Graves advised police that that person pulled out a handgun and stated, ["]give me the bag.["] The man then attempted to take Ms. Graves' backpack off her back, but she refused to release it and fought back. As they struggled over the backpack, the man placed Ms. Graves in a headlock and slammed her onto the ground. During this altercation[,] the suspect's cell phone fell from his pocket. And while Ms. Graves was on the ground[,] the suspect then fired his gun at her[,] striking her in the left shoulder, the stomach, and the legs[,] causing serious bodily injury to Ms. Graves. That individual then ran back to the vehicle and fired additional

---

[1] On the same day, Petitioner also pled guilty in a different case to two misdemeanors with time-served sentences run concurrently with the 25-year sentence in this case. Petitioner did not challenge those convictions in his post-conviction petition, and they are not before this Court.

[2] There is no judgment form in the record reflecting the disposition of Count Five.

- 2 -

shots in that direction, and Ms. Rosal[ind] Miller was grazed by a bullet on her right hip.

Ms. Graves confirmed that the phone that was discovered by police on the scene belongs to the man that had attempted to rob them, and that phone was submitted to the Metro SISU and certain text messages were extracted from that phone. Those text messages included essentially the date, congratulations to the person possessing the phone, congratulating him on finally becoming legal. It should be noted that this crime occurred on October 29th of 2014 and that the defendant's birthday would have been essentially the 31st of October. And he would have been turning eighteen at that time. The defendant was developed as a suspect and was placed in a photographic lineup where he was positively identified by both victims. Additionally there was a distinctive piece of clothing and animal print type of shirt that was described by the victims. There was an unrelated criminal investigation that led officers to finding a shirt that matched this description and submitting it to the Metro police crime laboratory. And it was found that his DNA was present on that distinctive animal print Versace shirt. All of these events occurred here [in] Davidson County.

During the plea colloquy, the trial court told Petitioner to ask for clarification from either Trial Counsel or the court if he did not understand something or if something was said about his plea agreement that was different from his understanding. The trial court explained to Petitioner the rights he was waiving by pleading guilty and the range of punishment for each offense. Petitioner agreed that Trial Counsel had discussed with him the charges he was facing, the range of punishment and release eligibility for each offense, the evidence against him, and any possible defenses. Petitioner also agreed that he initialed each section of the plea petition as Trial Counsel read through it with him, that he did not have any questions for either Trial Counsel or the court, and that he was satisfied with the work Trial Counsel had done on his case. The trial court informed Petitioner that he would be transferred to the Department of Correction as soon as space became available.

Defendant filed a petition for post-conviction relief on January 13, 2017. Post-conviction counsel was appointed and filed an amended petition on August 8, 2017.[3]

---

[3] According to the post-conviction court's December 21, 2017 order denying relief, Petitioner filed a pro se "Motion for Appointment of Different Counsel" on May 15, 2017. That motion is not in the record on appeal. Thus, Petitioner's allegation on appeal that the post-conviction court erred by failing to appoint substitute post-conviction counsel, which he also failed to support with any argument or citation to legal authority, is waived. *See* Tenn. R. App. P. 24, 27(a)(7); Tenn. R. Ct. Crim. App. 10(b). Moreover, the post-conviction court's order noted that in a status hearing on June 30, 2017, "Petitioner indicated that he was satisfied with current post-conviction counsel."

Petitioner alleged that his guilty plea was not knowing and voluntary due to the ineffective assistance of Trial Counsel. Specifically, Petitioner complained that Trial Counsel failed to conduct an investigation into the facts of the case and possible defenses, failed to adequately review and explain the discovery to him, failed to adequately explain his sentencing exposure and possible lesser-included offenses, and failed to pursue suppression of the DNA evidence.

At the November 6, 2017 hearing,[4] Petitioner testified that Trial Counsel was appointed to represent him after his case was transferred from Juvenile Court. Petitioner acknowledged that he was present during the transfer hearing in Juvenile Court and that he heard the testimony of the two victims. Petitioner received a copy of the discovery, including police reports, photographic lineups, and forensic evidence reports. However, according to Petitioner, Trial Counsel did not review the discovery with him and did not present any potential defense theories if the case went to trial. Petitioner knew that the victims identified him as their attacker and that a cell phone was found containing text messages wishing him a happy birthday, but he claimed that Trial Counsel did not explain how that could be used to establish his guilt at trial. Petitioner did not believe that Trial Counsel "even understood the case." Petitioner believed that Trial Counsel should have explained the charges to him more thoroughly. Petitioner expressed confusion about how he could be charged with two counts of attempted murder when only one person was injured and with especially aggravated robbery when nothing was actually taken. Petitioner also did not understand how a charge of aggravated assault in Juvenile Court could be indicted as attempted murder when transferred to Criminal Court.

Petitioner asserted that Trial Counsel visited him "[n]ot once" while he was incarcerated. Petitioner stated that he tried to call Trial Counsel, but "[h]e don't answer the phone." The one time Petitioner got Trial Counsel on the phone, "he acted like he couldn't hear me and he hung up on me." Petitioner filed complaints with the Board of Professional Responsibility about Trial Counsel's lack of communication. Petitioner asserted that he saw Trial Counsel only at his court dates, but Trial Counsel would tell him only "that I'm getting throwed off to another court date." According to Petitioner, Trial Counsel "didn't want to represent me on my case because he wasn't getting paid for it" and "he didn't have any other cases like this."

---

[4] At the beginning of the hearing, Petitioner requested a continuance to obtain copies of letters he had sent to the Board of Professional Responsibility regarding his "misgivings about [Trial Counsel's] continued representation of him at the time he entered into his plea." The post-conviction court denied the request for a continuance but stated that Petitioner would be allowed to submit the letters as a late-filed exhibit. According to the post-conviction court's order, Petitioner did not do so. Petitioner's allegation on appeal that the post-conviction court erred by failing to grant the continuance is waived for failure to support the issue with argument and citations to legal authority. Tenn. R. App. P. 27(a)(7); Tenn. R. Ct. Crim. App. 10(b).

Petitioner explained that he decided to plead guilty because he "was tired of sitting in the county jail with no help, with no fight on the other side from [Trial Counsel]. And I'm thinking I'm going to sign up for some Community Corrections time." Petitioner testified that he did not know that he was "pleading guilty to prison time" until "they came and got me for the penitentiary." Petitioner testified that Trial Counsel told him as they were going through the plea petition that he would be going home. Petitioner knew the length of the sentences he would be receiving, but Trial Counsel "said they was all going to run together with my Community Corrections." Petitioner stated that Trial Counsel did "[n]ot really" explain the plea petition. Petitioner testified that he did not read the plea petition but simply "signed when he told me."

On cross-examination, Petitioner acknowledged that he pled guilty shortly before his trial date and that he would have had to wait only a few more weeks to have his day in court. Petitioner testified that this was his first experience in the adult criminal system but acknowledged that he had multiple adjudications as a juvenile, including handgun possession, aggravated burglary, theft, and aggravated animal cruelty. Some of those adjudications were the result of trials in Juvenile Court.

Petitioner testified that he had obtained his GED while in juvenile detention and that he can read but that he did not read the plea petition as he signed it. Petitioner recalled the trial court asking him questions during the plea hearing and going over the offenses with which he was charged. Petitioner did not recall the trial court explaining the rights he was waiving or discussing the difference between attempted first degree murder with and without bodily injury, but he would not disagree if it was in the plea hearing transcript. Petitioner testified that Trial Counsel told him that he would be getting Community Corrections and that the plea petition did not say anything about going to prison. The judge asked Petitioner if he recalled her telling him at the end of the plea hearing that he would be transferred to the Department of Correction as soon as they had space available, and Petitioner responded that he did not know what that meant and that he was excited to be going home. The judge pointed out that the plea petition indicated "in prison" in the list of the possible punishments for each offense and that the firearm charge required 100% consecutive service. Petitioner stated, "I feel like I'm signing my life away. That's a long time." Although Petitioner testified at the plea hearing that he was satisfied with Trial Counsel's representation, Petitioner explained that he said that because he believed that he would be released upon entering his plea.

Trial Counsel testified that he had been a licensed attorney since 1995, that approximately forty-five percent of his practice was criminal law, and that he had represented clients charged with Class A felonies "[n]umerous times." Trial Counsel testified that he was appointed to represent Petitioner and that he does not treat his

- 5 -

appointed clients any differently than his retained clients. Trial Counsel testified that he takes his ethical duty to zealously represent his clients seriously.

Trial Counsel testified that he had an independent recollection of this case. Trial Counsel knew that the employment of a firearm charge required 100% consecutive service, so he focused his plea negotiations with the State "from the very beginning" on trying to get that charge dismissed. Trial Counsel also discussed with the State the recent change in the law distinguishing between attempted first degree murder with and without serious bodily injury with regard to release eligibility. Trial Counsel agreed that the State was adamant about what the lowest offer would be. Trial Counsel recalled an offer that included "a few lesser years, but the ranges were higher I thought. And I explained that to [Petitioner] also."

Trial Counsel recalled that the case was scheduled for several court dates and that he met with Petitioner each time. Trial Counsel testified that he also visited with Petitioner and believed that Petitioner was being housed "at the Hill building" at the time. Trial Counsel also recalled attempting to speak with Petitioner on the phone, explaining "There's sometimes you can't talk to them, but I don't ever remember hanging up on him." Trial Counsel provided Petitioner with the discovery in "a big, thick manila envelope full of documents that I gave to him during visitation, not in court."

Trial Counsel reviewed the discovery with Petitioner, specifically focusing on the cell phone and the DNA evidence. Trial Counsel also "emphasized" the importance of the victims' identification, explaining

> I voiced my concern, I said, these two young women are going to be on a stand in front of a jury saying that guy right there is the guy that shot me. I said, how are we going to get around that. I mean, you know, it really concerned me.

Trial Counsel explained that from his investigation and review of the transfer hearing, the victims, both freshmen at TSU, would be very credible witnesses and were both "positive" with their identifications of Petitioner. Moreover, their identification of Petitioner was corroborated by the DNA evidence on the animal print shirt and the birthday text messages on the cell phone.

Trial Counsel agreed that the case was eventually settled "on the eve of trial." Trial Counsel testified that he made sure to thoroughly review the plea petition because Petitioner had "reported me to the Board," so Trial Counsel knew "there was an issue between he and I." Trial Counsel went through the petition "line by line," reading it to Petitioner and having Petitioner read it himself. Trial Counsel told Petitioner not to initial anything he did not understand and to ask Trial Counsel for clarification.

Trial Counsel denied that Petitioner ever mentioned that he thought he was going to serve his sentence on Community Corrections. Trial Counsel recalled telling Petitioner "there's no chance" the State would offer an alternative sentence like Community Corrections. Trial Counsel testified that Petitioner's primary concern was when he was going to "get out." Trial Counsel discussed with Petitioner "in detail" his sentence and release eligibility and told Petitioner that he could not give him a specific "out date" because parole was not guaranteed. Trial Counsel believed Petitioner understood that he would be serving his sentence in prison.

On cross-examination, Trial Counsel was asked if he was concerned about Petitioner's ability to understand everything based on his age and education level. Trial Counsel testified that he had to speak to Petitioner "about this more than just one or two times" and that he had to "speak slowly" and "ask him if he understood," but Trial Counsel was "positive [Petitioner] knew what I was talking about." Trial Counsel conceded that he did not have Petitioner undergo a forensic mental health evaluation. Trial Counsel was aware of Petitioner's lengthy juvenile history.

With regard to his discussion with Petitioner regarding the evidence, Trial Counsel stated, "I asked him, I said, can you tell me - - how can you help me on this, what can I ask these girls, these women, when they testify and point to you and say that was him and I'm positive." Trial Counsel did not consider hiring an identification expert because "we had talked about settling it, and I didn't believe it was going to trial." Trial Counsel also did not hire an investigator to speak to the victims or speak to them himself, which Trial Counsel conceded "might have" been beneficial in developing any potential impeachment evidence.

The post-conviction court took the matter under advisement and issued a written order on December 21, 2017. Petitioner alleged that he only met with Trial Counsel on court dates, but the post-conviction court noted that the case had been docketed for seven discussion dates in 2015 and that Petitioner conceded that Trial Counsel had provided him with discovery. The post-conviction court concluded, "even assuming, arguendo, that Trial Counsel's interaction with the Petitioner was as substantively minimal [as] Petitioner alleges, Petitioner has still failed to show that the number of meetings he had with counsel was so deficient as to constitute ineffective assistance of counsel." However, the post-conviction court credited the testimony of Trial Counsel over that of Petitioner with regard to Trial Counsel's communication with Petitioner and his explanation of the evidence against Petitioner and the terms of the plea offered by the State. The post-conviction court noted that Petitioner did not present any evidence regarding his allegation that Trial Counsel was ineffective for failing to file a motion to suppress. As to the voluntariness of Petitioner's plea, the post-conviction court found that Trial Counsel thoroughly reviewed the plea petition and that Petitioner indicated his

understanding by initialing each paragraph. The post-conviction court found that there was no mention either in the plea petition or at the plea hearing of Community Corrections. The post-conviction court concluded that Petitioner entered his guilty plea "with an awareness of the consequences, and as such, his guilty plea was voluntarily and knowingly entered." The post-conviction court denied relief, and Petitioner filed a timely notice of appeal.

*Analysis*

*I. Standard of Review*

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, a post-conviction court's findings of fact are conclusive unless the evidence preponderates otherwise. *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006). Accordingly, questions concerning witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court, and an appellate court may not substitute its own inferences for those drawn by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

*II. Ineffective Assistance of Counsel*

Both the Sixth Amendment to the Constitution of the United States and Article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. *See Davidson v. State*, 453 S.W.3d 386, 392-93 (Tenn. 2014). In order to sustain a claim of ineffective assistance of counsel, a petitioner usually must prove both that counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580. "Indeed, a court need not address the components in any particular order or even address

both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

The test for deficient performance is whether counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. This Court must evaluate the questionable conduct from the attorney's perspective at the time, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Burns*, 6 S.W.3d at 462; *see also Strickland*, 466 U.S. at 690 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."). This Court will not use hindsight to second-guess a reasonable trial strategy, even if a different procedure or strategy might have produced a different result. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). However, this deference to the tactical decisions of Trial Counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

In order to determine prejudice, the question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). As stated above, a petitioner must show that there is a reasonable probability "sufficient to undermine confidence in the outcome" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* (quoting *Strickland*, 466 U.S. at 691). To establish prejudice in the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

However, in *United States v. Cronic*, the companion case to *Strickland*, the United States Supreme Court indicated that there may be exceptional circumstances "that are so likely to prejudice the accused" that a violation of the Sixth Amendment right to counsel can be presumed. 466 U.S. 648, 658 (1984). The presumption of prejudice under *Cronic* presents "a narrow exception to *Strickland's* holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense." *Florida v. Nixon*, 543 U.S. 175, 190 (2004). While *Strickland* applies to most "cases involving mere attorney error," *Cronic* applies to those cases in which there has been an actual or constructive denial of counsel. *Roe v. Flores-Ortega*, 528 U.S. 470, 482-83 (2000)

(internal quotation omitted); *see Strickland*, 466 U.S. at 692 ("Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice."). "A reviewing court will presume prejudice to an accused's right to counsel only when there has been the complete deprivation of counsel at a critical stage of the proceedings, a complete failure to subject the State's case to adversarial testing, or under circumstances of such magnitude that no attorney could provide effective assistance." *Berry v. State*, 366 S.W.3d 160, 174 (Tenn. Crim. App. 2011).

On appeal, Petitioner argues that he was effectively denied the assistance of counsel because Trial Counsel did not conduct an independent investigation, did not craft a defense strategy, made a "premature" decision that the case should be settled by plea agreement rather than trial, and did not adequately communicate with Petitioner to ensure that he understood the charges he was facing and the terms of the plea agreement. According to Petitioner, "Trial Counsel's failure in attempting to deconstruct the prosecution's case at any time deprived [Petitioner] of 'meaningful adversarial testing' and constitutes a Sixth Amendment violation under the *Cronic* standard." Petitioner argues that the post-conviction court erred by analyzing his claim of ineffective assistance of counsel under the *Strickland* standard rather than under *Cronic's* presumption of prejudice. However, Petitioner did not argue that he was entitled to the presumption of prejudice under *Cronic* in either of his petitions for post-conviction relief or at the post-conviction hearing. The State argues that Petitioner has thereby waived our consideration of this issue. *See Walsh v. State*, 166 S.W.3d 641, 645 (Tenn. 2005) ("Issues not addressed in the post-conviction court will generally not be addressed on appeal."). However, this Court has previously reviewed a petitioner's claim under *Cronic* even though it was not presented to the post-conviction court. *See Jay Dee Garrity v. State*, No. M2016-01463-CCA-R3-PC, 2018 WL 1691296, at *9 (Tenn. Crim. App. Apr. 4, 2018), *no perm. app. filed*; *Marcus Nixon v. State*, No. W2006-00618-CCA-R3-PC, 2007 WL 1215031, at *7 (Tenn. Crim. App. Apr. 20, 2007), *no perm app. filed*. Moreover, the United States Supreme Court has held that "whether we require the defendant to show actual prejudice . . . or whether we instead presume prejudice turns on the magnitude of the deprivation of the right to effective assistance of counsel." *Flores-Ortega*, 528 U.S. at 482.

While we do not consider Petitioner's argument waived, we do consider it unconvincing. In order to establish the constructive denial of counsel, a petitioner must show that "although counsel [was] present, the performance of counsel [was] so inadequate that, in effect, no assistance of counsel [was] provided" at all. *Cronic*, 466 U.S. at 654 n.11. The United States Supreme Court has clarified counsel's "failure to test the prosecutor's case . . . must be complete" and must have occurred "throughout the . . . proceeding as a whole" rather than "at specific points." *Bell v. Cone*, 535 U.S. 685, 697 (2002). In *Cronic* itself, the United States Supreme Court held that prejudice could not be presumed based simply on counsel's lack of experience and short amount of time to

prepare for trial. 466 U.S. at 663-66 (remanding for reconsideration under *Strickland* standard). Additionally, an allegation that counsel failed "to investigate and pursue all avenues of defense" has been considered more appropriately analyzed under *Strickland* "rather than as a fundamental breakdown of the adversarial process such that prejudice is presumed under *Cronic*." *Chadwick v. Green*, 740 F.2d 897, 901 (11th Cir.1984); *see also Woodard v. Collins*, 898 F.2d 1027, 1029 (5th Cir. 1990) ("[A] decision to investigate some issues and not others or even a decision to conduct virtually no investigation is governed by *Strickland* and its progeny."). Thus, Petitioner has the burden of overcoming the "strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015).

The evidence in the record does not preponderate against the post-conviction court's findings that Trial Counsel reviewed the discovery, negotiated a favorable plea, met with Petitioner on multiple occasions both in and out of court, and advised Petitioner regarding the strength of the State's case and the terms of the plea agreement. Petitioner's allegations of Trial Counsel's supposed failures are not so complete and so egregious that Petitioner was functionally without counsel prior to the entry of his guilty plea. Petitioner's reliance on *Cronic's* presumption of prejudice is far-fetched. Trial Counsel was clearly "more than just a warm body to stand next to" Petitioner during the plea hearing. *United States v. Smith*, 640 F.3d 580, 589 (4th Cir. 2011) (quoting *United States ex rel Thomas v. O'Leary*, 856 F.2d 1011, 1015 (7th Cir. 1988)).

Moreover, Petitioner failed to produce any evidence at the post-conviction hearing that additional investigation by Trial Counsel beyond reviewing the discovery provided by the State, including hiring an investigator or an expert witness, would have produced any information favorable and material to his case. *See Owens v. State*, 13 S.W.3d 742, 756 (Tenn. Crim. App. 1999); *see also United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial."). Petitioner waived his allegation with regard to Trial Counsel's failure to file a motion to suppress by failing to produce any evidence or legal argument in the post-conviction court that such a motion would have been successful. *See Craig Abston v. State*, No. W2014-02513-CCA-R3-PC, 2016 WL 3007026, at *9 (Tenn. Crim. App. May 17, 2016), *perm. app. denied* (Tenn. Aug. 18, 2016). Additionally, Petitioner has failed to show that Trial Counsel's decision to pursue plea negotiations was unreasonable, especially given the strength of the State's case, the credibility of the victims, and the dearth of viable defense strategies. *See Michael D. Lyles v. State*, No. M2005-01857-CCA-R3-PC, 2006 WL 1931724, at *6 (Tenn. Crim. App. July 12, 2006), *perm. app. denied* (Tenn. Nov. 20, 2006). As the *Cronic* Court itself recognized:

- 11 -

[T]he Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade. . . . And, of course, even when there is a bona fide defense, counsel may still advise his client to plead guilty if that advice falls within the range of reasonable competence under the circumstances.

*Cronic*, 466 U.S. at 657 n.19 (citations omitted). Petitioner has failed to show any deficiency on the part of Trial Counsel, much less a deficiency of such magnitude that Petitioner was constructively denied the assistance of counsel. Thus, Petitioner is not entitled to relief under either *Strickland* or *Cronic*.

### III. Validity of Guilty Plea

To satisfy constitutional standards of due process, a guilty plea must be entered knowingly, intelligently, and voluntarily. *Boykin v. Alabama*, 395 U.S. 238, 243 (1969). When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). In making this determination, the reviewing court must look to the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). This Court may consider the following circumstantial factors:

the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from trial.

*Blankenship v. State*, 858 S.W.2d 897, 905 (Tenn. 1993). "[A] plea is not 'voluntary' if it results from ignorance, misunderstanding, coercion, inducements, or threats." *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). A defendant's solemn declaration in open court that his plea is knowing and voluntary creates "a formidable barrier in any subsequent collateral proceeding" because these declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

Petitioner argues that his guilty plea was not knowing and voluntary due to the ineffective assistance of Trial Counsel. As stated above, the post-conviction court found that Trial Counsel met with Petitioner on multiple occasions, provided Petitioner with

discovery, and negotiated a plea with the State. Trial Counsel thoroughly reviewed the plea petition with Petitioner and had Petitioner initial each paragraph to indicate his understanding. Petitioner had obtained his GED and was capable of reading the plea petition, even if he chose not to. Moreover, Petitioner testified at the plea hearing that he had read the petition and that he understood the charges he was facing, the terms of the plea he was entering, and the rights he was waiving. Even though there are differences between Juvenile Court and Criminal Court, Petitioner's numerous delinquent adjudications indicated a familiarity with the criminal justice system. The post-conviction court found that "Petitioner's primary complaint is he wanted out of custody and he thought entering the plea would enable him to go home." However, the post-conviction court credited the testimony of Trial Counsel that he and Petitioner discussed parole eligibility, which indicated to Trial Counsel that Petitioner understood that he would be going to prison. Trial Counsel denied telling Petitioner that the State's offer included an alternative sentence, and Community Corrections was never mentioned either in the plea petition or at the plea hearing. The evidence in the record does not preponderate against the findings of the post-conviction court, and Petitioner has failed to prove his allegations by clear and convincing evidence.

On appeal, Petitioner also argues that his plea was rendered unknowing and involuntary due to Trial Counsel's ineffective assistance in explaining his potential sentencing exposure if his case went to trial. According to Petitioner's appellate brief, Petitioner entered his plea "based on an understanding that his exposure was much greater at his sentencing range than it actually was." Rather than claiming that Trial Counsel provided inaccurate advice, Petitioner simply claims that it was "not probable" that he would have received the maximum sentence for each offense or be ordered to serve each offense consecutively "given his lack of a felony criminal history." At oral argument, Petitioner pointed out that the plea petition stated the entire sentencing range for each offense rather than only the Range I sentencing range, claiming that this was error based on *James M. Meese v. State*, No. M2017-00909-CCA-R3-PC, 2018 WL 3154348, at *9 (Tenn. Crim. App. June 26, 2018) (finding ineffective assistance when Trial Counsel "made no effort to determine the [p]etitioner's applicable sentencing range" and advised the petitioner that he faced a maximum sentence over twice his actual exposure). However, we agree with the State that this issue is waived for being raised for the first time on appeal. *Walsh*, 166 S.W.3d at 645. Other than a single sentence in his amended petition stating that "when the maximum possible [sentencing] exposure is overstated, the defendant might well be influenced to accept a plea agreement he would otherwise reject," the issue of Petitioner's sentencing exposure was never discussed in the court below. Moreover, a trial court may consider a defendant's juvenile record in determining the length and manner of service of a defendant's sentence. *See* T.C.A. § 40-35-114(16); *State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997); *State v. Stockton*, 733 S.W.2d 111, 112-13 (Tenn. Crim. App. 1986). Additionally, at the plea hearing, the trial court reviewed the sentencing ranges that Petitioner faced as a Range I,

standard offender.  There is no evidence in the record that Trial Counsel provided inaccurate advice regarding Petitioner's sentencing exposure.  Thus, Petitioner is not entitled to relief.

*Conclusion*

Based on the foregoing, we affirm the judgment of the post-conviction court denying relief.

_____
TIMOTHY L. EASTER, JUDGE